Thank you, Your Honor. May it please the Court, my name is Rob Miller from Sheehan, Finney, Bass & Green in Manchester, New Hampshire, and I have the pleasure this morning to represent the Cedar Rapids Lodge & Suites in this appeal. This is an appeal of a district court order from the Northern District of Iowa granting summary judgment to Lightowler Johnson on January 6, 2012. We have appealed that order and have three primary arguments. First, that the district court erred as a matter of law in failing to set the time of accrual of a cause of action against Lightowler Johnson as the time of injury to Cedar Rapids Lodge & Suites. Second, that the federal district court failed to apply either the Federal Common Law Doctrine of Adverse Domination or the Iowa State Court Analog as announced in Clap v. Wallace. And third, in finding that the June 19, 2003, what I call the draft agreement between Lightowler Johnson and Cedar Rapids Lodge evinced a meeting of the minds between the parties. Our argument is that the facts are very clear that there was no meeting of the minds between the parties. There was no meeting of the minds? Correct. No meeting of the minds. So, the district court applied a five-year statute of limitations for tort claims, looked at the contract, and then analyzed the case under a contract theory instead of a tort theory, which we allege as error. In the case of Kemen Industries out of Iowa and a number of cases that we cite from other circuits around the country, tort claims are not controlled by a contractual choice of law provision. And so we argue that the correct statute of limitations to apply here is Iowa's five-year statute of limitations as applied to tort claims. It almost seems that that was conceded. I don't think there was an argument made against that, was there? Well, it was hard to understand. The district court order went both ways, and then Lightowler's brief did appear to concede that issue, but I wasn't completely sure. I think they said even if you're right, you lose anyway. Yeah, and I think that gets to the question of the accrual and adverse domination question. So, I'm going to move on to that. First, we're going to argue the accrual issue. The plaintiffs allege three theories of negligence against Lightowler-Johnson. Negligent design and preparation of the plans, failure to identify structural defects, and importantly, departures from the franchise building standards. When you're doing a flagged hotel, there is a very clear set of building standards that you have to follow. And if you don't follow that set of building standards, the hotel will not be flagged with the franchise label. And third, and perhaps most importantly, a failure to notify the Cedar Rapids Lodge and Suites as an entity, as opposed to John Seibert alone, who was the managing governor, who did not share the conversations that he was having with Lightowler, with anyone else in the organization. And hence, the argument that the Cedar Rapids Lodge and Suites entity was adversely dominated by one person who controlled all the information. So, the question of... Am I to understand that there was a person to report to, and that person was reported to, but it should have been more people? Well, the problem was, and this is where sort of the crux of the matter. John Seibert was the controlling person in the Cedar Rapids Lodge and Suites. He was the managing governor, and he was directing Lightowler Johnson to do things that were not in the best interest of the entity. By way of example, if you look at Lightowler's appendix on page 92, they show a letter from American flagging a bunch of problems with the plans, saying these plans are not in accord with a number of our building standards. And there's a sticky note on that letter that says, called John Seibert, 12-16-03, left a message on which ones he wants us to do. And there's a second sticky note that says, not anything to do, just ignore, per John Seibert. So, John Seibert directed Lightowler Johnson to ignore the building standards, even though Lightowler Johnson was an approved architect by American, the franchisor, and knew that it was responsible for complying with the building standards when designing a franchised hotel. No one else in the entity knew that John Seibert had told Lightowler not to comply with building standards. Even the other two defendants that we sued in the underlying case, Ted Vosburgh and Mark Gabrielson, testified that they had no idea that any of this was going on. So he controlled the entire body of knowledge. And my clients, the governors who took over the hotel afterward, were passive investors at the time. They had no idea. They weren't involved in any of these discussions. There was no dissemination of information. They were trying to get information, but Seibert wasn't providing. And so that's part of the thought. In other words, these passive investors were not asking enough questions. No, they were asking questions. They were asking questions. They were asking questions. And the record is replete with examples of them asking questions of John Seibert, and John Seibert either not responding or responding with non-answers in the written record, to the point where finally they got themselves organized. And on October 16, 2008, they removed the leadership of the Cedar Rapids Lodge and then started to discover some of these problems. And then once that happened, for example, they discovered that the hotel was operating without a certificate of occupancy because of some of the code violations that Lightowler was aware of, supposed to fix, did some in construction administration throughout the process of the building. Is there evidence that Seibert and Lightowler were conspiring for some mutual benefit? I did not allege that Lightowler Johnson was part of the RICO conspiracy. As you know, in the underlying case, we prevailed on the RICO claim against John Seibert, Ted Vosburgh, and Mark Gabrielson. So what state has gone as far as you suggest in applying this adverse domination doctrine, and what makes you think Iowa would agree with it? Well, in the case of Platt v. Wallace, Iowa uses an old case. It's a case from 1936. But they use language before the adverse domination doctrine was ever actually named. They have the theory in their decision. They say, it may be the general rule of law in ordinary transactions that knowledge of the agent constitutes knowledge to the principal. Such rule, however, does not apply where the circumstances are such as to raise a clear presumption that he will not communicate his knowledge to the corporation. That is, where the fact is that one in which he is interested in concealing from it, and accordingly the corporation will not be charged with notice of facts of which an officer or agent acquires knowledge while acting in a transaction adversely to the corporation or in a scheme in which he is engaged to defraud the corporation. So why would Lightowler make that sort of assumption, merely because Seibert said ignore these particular problems? Why would Lightowler make the assumption that it wouldn't be communicated to the remaining parties in the corporation? Well, because Lightowler is an American approved architect. They understand that when they're designing a hotel, they are responsible for complying with franchise standards. In fact, in the Midwest hospitality contract that they did, they call that out and they say we are responsible for complying with franchise standards. So they know that. So when they get a direction from the managing governor that says ignore the franchise standards, they know they can't do that. That should be a big red flag that says, hey, wait a minute, and we, the architect, are responsible to the organization, not just to this one person. If he's going rogue on the rest of the organization, maybe we should talk to somebody. All they have to be is negligent, and we allege that they are for that reason. So do you have any jurisdictions adopted this rule as to third parties who are not conspiring with the bad actors? Yeah, there are three or four cases cited in our brief that deal with lawyers, accountants, outside law firms, and they don't require involvement to the level of a conspiracy. All they require is active involvement. And there was active involvement here between Seibert and Lightower that gave enough notice to Lightower that something was amiss. When you are a franchise-approved architect and you get a message from somebody saying that you just ignore the franchise standards and you don't do anything about that, it's inherent in the relationship in your approval as an architect approved by the franchisor that you know because you've gone through that approval process that this is critical. It's the whole ballgame for the hotel. If you don't comply with the franchise standards, you don't get the flag. And that's part of what the new governors had to deal with in going forward in trying to make these repairs and corrections and all of that in order to hold on to the flag. Is there anything in the record to indicate how many previous times this Lightower organization had been involved working with this franchisor in constructing, designing, and authorizing a property such as this, which is a motel or a hotel, whatever it is, some kind of a public facility? Lightower was a newly approved architect in the American family. But in their November 1st letter that they sent to Lightower, which is at the appellee's appendix at page 95, they make it very clear that they understand what the rules are. Because they say in this letter, we have always worked hard to advise clients of franchise standards and detailed buildings to meet those standards. We would not want this project to jeopardize our status as an approved architectural and engineering firm for American. So they know. And they know that the direction they got from Cyber was not in compliance with that responsibility. And that's negligent. And my clients, of course, had no idea that any of this was going on until they overthrew the leadership, sued them for RICO, took discovery, and found out, for example, that they didn't even have a certificate of occupancy and they were operating a public building taking guests in a hotel that had numerous life safety issues and would have jeopardized their insurance if anything had happened because there was no CO. How long were your clients in charge before they removed the officers? They discovered a problem. How long were they in charge of the company before they removed the officers? It was the same night. They got themselves together in June of 2008 because there was an issue about money for a capital call that was missing. That's the time they became owners? No, no. They were passive investors. How long were they passive investors in control of the entity? About four years. About four years. And you're saying during those four years they were asking questions of Seibert but he was not responding or giving non-responsive answers? That's right. That's right. And in the underlying case for which Seibert was a RICO judgment issued against him for a $15 million judgment, there was a long record of that, of requests for information and information not forthcoming, annual meetings that weren't held, annual meetings where questions were asked and not responded to, and then there was a promise for follow-up that didn't happen. And remember, these investors come from all over the place. There were some in Illinois. There were some in Iowa. There were some in Minnesota. There was one in New Hampshire. And so it was hard for them to get together. But finally when they did in June of 2008 and they got themselves together, the next meeting in October they overthrew the leadership and the case was brought a year later after we had gotten all the evidence together. So in terms of the question of adverse domination, it kind of gets down to a theoretical question. It's just another variant of a discovery rule. And you have to ask yourselves, all right, why should this doctrine be adopted? And in jurisdictions like Iowa that adopt the discovery rule, you look at it's akin to an agency analysis, right? You have a rogue director who is not sharing information with the rest of the entity. He is acting outside the scope of what you would expect a managing member of an LLC to do. And so you can't charge the rest of the entity with responsibility for that rogue member's actions. It was an inherently unknowable situation. No one in the group of passive investors had any idea that there was something wrong with the hotel. They didn't know that there were franchise issues. They had no idea that the franchisor was threatening to pull the flag. And the best example is they didn't know that the hotel was operating without a certificate of occupancy. If they had, they would have raised holy heck about that because they were all personally guaranteeing the hotel. They were personal guarantors on the note. I guess the key is doesn't Lightowler have to be complicit in that activity? They need to be an active participant. That's what the case law says. They don't have to be co-conspirators. They only have to be active participants. Which jurisdiction are you referring to when you say that's the rule? It's in our brief, Your Honor. I'm not sure that I can put my hands on it immediately. I have some time for rebuttal, and I'll look for it. Well, you cite some cases, and the other side comes back and says those are conspiracy cases. So I wanted to make sure I understood which ones you say go beyond conspiracy cases. So maybe you could make sure we're clear on that when you come back. Okay. I see that my time is waning, so I will sit for now, and I'll come back for rebuttal. You can go ahead and answer that question. I think he said he didn't know. I have to look in the record. Thanks. Good morning. Good morning. May it please the Court, my name is Dana Oxley. We're Shuttleworth and Ingersoll in Cedar Rapids, and I'm here representing Light Teller Johnson, the architect in this case. As counsel for Cedar Rapids Lodge has conceded, the only way this court can reverse the district court below is to adopt one of two methods, doctrines that have not been recognized by Iowa and are actually contrary to Iowa law. And just so that I don't forget, I want to address a couple of specific points that were raised by Mr. Miller. Real quick, are you abandoning the, because I didn't see any argument defending the North Dakota statute. Frankly, we're not abandoning it. The court can, of course, affirm on any basis. It gets into a choice of law analysis, which frankly is a little bit thorny. Judge Reed did properly go through the choice of law analysis and concluded that Iowa would consider the choice of law provision in the contract, even though it's a tort claim, because it's a tort claim based on a contract. And she cited Iowa cases for that proposition. But frankly, it just seemed a much more direct route, because it's quite clear under Iowa law that Iowa courts would not adopt the adverse domination theory that's been proposed. It just seemed like a much more straightforward way to address the appeal. Okay. Cedar Average Laws says that, first of all, that active participation is all that is needed for the adverse domination without really providing any authority. But beside that point- He said he's going to come back with a great case. Right. So if you know what he has in mind, you could address it. I actually don't, Your Honor. Okay, all right. But putting that aside for a second, all he says is that Lightower was involved because they were the architect. And the only evidence that he's addressed that might show some kind of complicity relates to the American standard. And I just want to make clear that the franchise agreement was between Cedar Average Lodge and Suites and American Inn. Lightower was an approved architect, but there was no contractual requirement that required on this particular project, Lightower, to follow the standards. They might have lost their ability to do the next American Inn project if they didn't comply with what American Inn wanted. But there's no contractual obligation. That obligation is on Cedar Average Lodge as the owner and the builder and the franchisee with American Inn. And related to that, then, also, there is a provision and a method for seeking a waiver for certain of the American requirements. And so to the extent that Mr. Seibert is telling Lightower Johnson, don't worry about those discrepancies that have been pointed out. I'll take care of that. That shouldn't have raised any flags to Lightower Johnson, necessarily, because they were also aware of this ability that American Inn could actually waive some of those requirements. And so there's not anything complicit that Lightower Johnson had with Cedar Average Lodge or with Mr. Seibert. American Inn had its own project manager on the ground, Sean Lidberg, I believe was his name, who actually was the one that led most of the site visits that were performed. And so American Inn had their own person on the ground, and he was also talking directly with Mr. Seibert, as well as the council said this morning that Mr. Seibert was the lone dominating, adversely dominating director. But, in fact, Mr. Gabrielson and Mr. Vosburgh were involved in the construction process itself. Mr. Gabrielson actually is the one that signed the check to pay Lightower for their invoices. So they were on the ground and also involved in some of those site visits as well. But so the bottom line in this case really does get down to would Iowa courts apply the adverse domination doctrine? And I think it's quite clear under Iowa law that they wouldn't. To the extent that council wants to argue that the court should apply federal common law rather than look to the state law, to the extent that that is ever even considered is when a federal court is borrowing a state statute of limitations for a federal cause of action. This clearly is a state negligence claim. The state statute of limitations and the state tolling rules also apply. The Supreme Court actually made note of that. I don't have it. And so the most direct case on point from Iowa is the regal insurance case that we've cited in our case. And that case actually relied on the clap case that was referred by Mr. Miller this morning. As made clear in regal insurance under Iowa law, notice to an officer is notice to the entity even if the fact is never conveyed to the entity. And Mr. Miller made quite clear that the individuals that ended up taking over the entity were passive investors. And they were passive for a reason. They put in their money and they relied on someone else to take care of the project. To the extent that they were asking questions, I'd be curious to know when those questions were asked. Simply from the standpoint that Lightower was involved in the design and the construction, which was done in 2004. These investors didn't take over until 2008. So I'm not sure when exactly those questions were being asked. We were under construction for four years? No, no, no. The plans were completed in November of 2003. Construction commenced, I believe, in January of 2004. The hotel was opened in December of 2004. So it was completed and the hotel was opened in December 2004. It wasn't until 2008 when the other investors came in and kicked out Mr. Seibert. I think the cases Mr. Miller is referring to are probably those cited on page 27 of his brief, where he refers to some cases from other circuits that told claims against what he describes as third-party accountants, lawyers, stockbrokers, and so forth. And I gather the argument is, by analogy, an architect in this kind of relationship with a company like CRST is comparable to those third parties in the cases cited. Do you have any comment on that? I do, Your Honor. And it's that an architect is very different, actually, than an accountant or an attorney that's involved in those cases. And I believe the accountant did the case. I don't remember the cases by name. Well, he's got Gardner, Mosesian, Bornstein against Polis from the First Circuit, and IT versus Kornfeld, stockbroker case, based on the parentheticals. Right. And the case involving the accountant, there was evidence that the accountant was complicit in the actions of the wrongdoer that was involved in the entity. And the accountant also was hired for the purpose of catching financial errors that had occurred or discrepancies that had occurred. So that accountant actually had a contractual duty, as well as a fiduciary duty, to catch discrepancies that would reveal. It's the whole purpose of an audit, or one of the purposes of an audit, is to reveal any wrongdoing that might be happening by. So you think these are special relationship cases? They very much are, Your Honor. And that kind of brings us to another point that I believe Mr. Miller intended to talk about. I'm not sure if he actually got to it. But Lighteller's duties were determined by the contract. And to the extent that Cedar Rapids Lodge wants to call it a draft contract, it was the contract. It's the only contract. The June 19, 2003 contract is the only contract that was ever developed or ever produced in the case. It was signed by Steve Goldade of Lighteller Johnson, who forwarded that contract to Mr. Seiberg, asked him to sign it. He didn't sign it. He sent it to him again. And this time he never signed it. But Mark Gabrielson signed a check for the exact amount of the invoice that was with that contract and sent it back to Lighteller. Both parties operated under that agreement. Lighteller accepted the benefit of that agreement by receiving the plans and the work that Lighteller did. To the extent that Cedar Rapids Lodge wants to try and discredit Mr. Seiberg as saying he's contrary to their interests and so you can't believe his credibility, even though he says, you know, I, as Cedar Rapids, the president of Cedar Rapids Lodge and Tower, considered this agreement. Not only has he said that during litigation, but he said it in 2005 before any, while he was still involved, you know, three years before he was kicked out when he sent the same contract to his own attorney saying, here's the architect agreement even though I didn't sign it. There couldn't be a more clear case of even though the contract wasn't signed, both parties intended for this contract to be the contract that controlled. So that brings us back to what Iowa courts consider adverse domination. And as I started to explain, in regal insurance the court recognized a limited exception to the agency rule that notice to an officer is notice to the corporation even if a fact is not actually conveyed to anyone else in the entity when the officer has completely abandoned the interests of the entity so as to act to the detriment of the entity. And that case involved a series of transfers of stock from First International Assurance Company, which was a defunct insurance company, and they transferred some of its stock fraudulently, which eventually arrived in the hands of an entity called Roger Williams. And one of the directors who was involved in fraudulent transfer of the stock tried to use the stock then to legitimize Roger Williams as an insurance company in Louisiana. And eventually the first entity went into bankruptcy and they tried to get the stock back as a fraudulent transfer. And the second entity claimed it was a bona fide purchaser for value and said that it wasn't on notice of the fraud because this director was acting contrary to its interests. And the court said the officer was not acting contrary to the interests of the second entity when it used the security in an attempt to establish domicile, which was a legitimate purpose. And in the same way here, Mr. Seabird might have been trying to defraud the other investors by according to the RICO charges, he told them he was putting equity into the entity when he was not and he was fraudulently trying to get them to invest. But it was in his best interest and the entity's best interest to get the building built, to contract with Light Tower for architectural services, to participate in the walk-through site visits of the project, all those things he was doing for the benefit of Cedar Rapids Light Lodge and Suites. And that's when the alleged design issues, the alleged construction issues all were brought to his attention. And so by bringing it to his attention, they were necessarily brought to the attention of Cedar Rapids Lodge. The design issues were first raised in November of 2003. The construction issues were raised during the July 2004 walk-through and the October 2004 walk-through. And those involved, it wasn't just Mr. Seabird and an individual from Light Tower participating. It was Sean Lidberg who was the project manager from Corporate American. Mr. Vosburg and Mr. Gabrielson were involved in some of those walk-throughs. And Light Tower actually was only involved in the July site visit. And that was at the request of Cedar Rapids Lodge. And that kind of brings us back to the agreement and what were Light Tower's duties and why this case is not similar to the cases involving accountants and lawyers. Even Cedar Rapids Lodge's experts agreed that the architect's duties are determined by the contract itself. The contract, the June 19th contract imposed on Light Tower the duties to provide design services, provide the final plans, assist in getting the building permits, and interpreting the plans during construction. And it did that. It had a separate provision that said if there are going to be site visits, then that's only upon request of the owner. Otherwise, Light Tower would not be involved in the site visits. And so under that provision, Light Tower did participate in one site visit. But the point of all that is that Light Tower was only engaged and Cedar Rapids Lodge only paid them to interpret the contract, interpret the plans during the construction process. Otherwise, they had no other responsibilities during construction. Cedar Rapids Lodge had its own project manager. Mr. Seibert was there. Tim Terrell, who was a contractor, was also a governor of Cedar Rapids Lodge. And then Sean Lidberg from American was the project manager. And so Light Tower was not providing any of those kind of contract services. And in its brief, Cedar Rapids Lodge tries to make a lot of this idea that Light Tower was involved in construction administration by referencing a deposition of one of the Light Tower employees back in North Dakota. And all that really, if you read that deposition transcript, Ms. Robin Evans, I believe was her name, just testified that when Light Tower was asked to change designs on the building, then they changed the designs. And while she might have considered that construction administration, it has nothing to do with the kind of construction administration that was deleted from the contract and was not one of Light Tower's duties. The contract was redacted to remove some of the construction-based duties from Light Tower's obligations. And one of them said, administer construction as between the owner and the builder. And Light Tower was not needed to do that because Seberg and Tintrell worked together themselves. And so Light Tower's duties did not go to any of the construction-based issues other than when it was asked to interpret the plans, which it did. So Light Tower participated in the July 2004 site visit. It raised some issues and brought those to Mr. Seberg's attention. After the October 2004 site visit, a letter was sent to or just a list of some of the discrepancies were sent to Light Tower Johnson just as a matter of copying. And on November 1, Light Tower sent a letter back to everyone saying, hey, by the way, you realize we're not doing construction administration. So at the very latest, Mr. Seberg was on notice by November 1, not only of all these alleged defects that have been brought out through the site visits, but also that Light Tower Johnson was not the responsible party. Seberg never questioned Light Tower about that letter, never asked them to come back and do anything. There just is simply nothing in the record that imposed on Light Tower an obligation to be there through the end of construction. Light Tower's duties were based on the contract and the last thing they did was in September 2004 when they interpreted the plans related to a stairwell. And other than that, their duties ended at that time. And so this idea about completion of construction really has nothing to do with, even if completion of construction might be when an injury would arise related to the builder, which is to the extent that Cedar Rapids Lodger relies on the Bob McKenna's case from Iowa. The defendant in there was actually the entity that constructed the building. And in this case, and the court addressing a statute of repose that's in Iowa Code 614.1, said that the statute of repose begins when the defendant's actions give rise to a claim. And in this instance, the defendant's actions, Light Tower's actions, would have been when it designed the plans in 2003 and when it performed its interpretation throughout 2004 up until September 24th. And so even if you were to look at a completion or when the defendant's actions gave rise to, Light Tower's duties ended with the last thing that they were asked to do in September 2004. And there just simply is no way to move that time within the five-year time period. The case was brought in December 2009. So the opening day is a convenient day for Cedar Rapids Lodge to pick because it happened to be the day before five years, the five-year statute of limitation would have run. Was the contractor that actually did the hammer and nail part of the facility, have they been a litigant in this litigation or in separate litigation but arising out of the same? Tim Terrell was one of the governors of the Cedar Rapids. He was one of the initial investors, and I believe he was listed in their RICO claim. Yes or no? Frankly, that didn't involve Light Tower. So he was not involved in any of the litigation. What was the last point you made about the opening being the day before the statute runs? You're saying that you think the last thing Light Tower was asked to do was in September of 2004. Right, and under Iowa's discovery, the way Iowa applies the discovery rule is when a plaintiff is on notice, on inquiry notice that it's been injured, and that date would have been at the latest, September or November when Light Tower gave the letter. September or November of 2004. The action was brought on December 3rd, 2009, and so December 3rd, 2004 would be the cutoff date. The hotel was either open on December 4th or December 9th of 2004. Was there a fact question about when this inquiry notice occurred as between September, November, December? Light Tower was never asked to do anything after September when they interpreted the plans related to the planks and the stairwell. Why did you say maybe November? On November 1, Light Tower sent a letter. When they got a copy of the October site visit, they sent a letter to everyone, including Siebert, saying we haven't been involved in construction administration throughout this whole project. That put everyone on notice that Light Tower wasn't taking responsibility for anything. Light Tower was never asked to do a punch list. Light Tower was never involved in the final inspection. It was not asked to be involved in the final inspection. Under Iowa law, the inquiry notice is the first time that you're put on notice. You don't have to know of the extent of your injury or even the exact cause of action, just that you've been injured. If the design and the construction issues are what is how Light Tower injured the plaintiff, then they were certainly on notice by November 1 when they received that letter. Thank you. Thank you very much, Ms. Oxley. We will now hear in response Mr. Miller. And it looks to me like you're coming up with a lot of things you found in your briefcase. Well, just to answer the question that you're going to ask me, those were the cases that I was thinking of. And those cases that Judge Colleton referred to require active participation. They do not require a conspiratorial relationship between the parties. And Judge Reed, on page 5 of her order, actually refers to the fact that there is a common nucleus of operative fact between the retail claim and the negligence, which is active participation sufficient to get there, I think, for purposes of adverse domination. Let's take a step back, though. What Light Tower is asking you to do is to apply a statute of limitations. They designed a defective building. The building has given the new governor's fits to correct. They are asking you to apply a statute of limitations, a five-year statute of limitations, on a negligence theory and not to apply a discovery rule, even though, A, there was a controlling member who has gone down on a RICO claim for fraud and a number of other things that are very clearly, I think, the phrase that Regal Insurance uses is indicative of completely abandoning the interests of the entity. If going down on a RICO claim doesn't completely abandon the interests of the entity, I'm not sure what would. What Regal Insurance says is, Notice to an officer or director is not imputed to the corporation where the officer is acting in conflict with or to the detriment of the corporation. Telling the architect don't worry about the franchise standards and then doing a bunch of other things, failing to disclose information, and then going down on a RICO claim gets you to the Regal Insurance standard, acting to the detriment of the corporation to the point where you can apply the adverse domination doctrine, either under federal common law or using CLAC. Was telling the architect not to fix these things part of the RICO claim? No. No, because I didn't think it was sufficient to get to a conspiracy level. I think it was just negligent. There's a second theory, though, this question of when does the claim accrue. During the course of construction, you have punch list. You have construction administration. You have final cleanup, and there is a lot of law. Chris Chiles refers to some of it, and the other case, McKinnis refers to it, where you do not want to disrupt the ability of two parties to correct problems during construction. To find that an injury occurred to Cedar Rapids Lodge and Suites before completion of construction and the opening of the hotel, which was on December 9th, 2004. To find that an injury occurred before that date would be bad policy because it would say that a litigant needs to bring a claim against an architect before there's been a time for cure of defects. In the architectural relationship, these matters get corrected up to the day of opening of the hotel, the issuance of a certificate of occupancy, or the issuance of a certificate of substantial completion. If you look at Lightowler's letter, the November 1 letter that Ms. Oxley referred to, they don't foreclose further involvement. They don't say our work here is done. What they say is, if there's anything else you need from us, please don't hesitate to contact us. And that's what the relationship had been like throughout the entire summer of 2004. There was construction administration that went on throughout the summer, and there was nothing to give Cedar Rapids Lodge any notice that Lightowler considered their duties to be at an end. Finally, in our briefs, you'll see that they also have an ethical duty that arises out of their codes of ethics because they are stamping plans. That they have an ethical responsibility to do a final walkthrough and make sure that the building as built complies with the plans they designed, which it did not. Very last thing, please look at the contract, the June contract, which Ms. Oxley wants you to say evinced a meeting of the minds. There's lots in our brief to show you that there was no meeting of the minds,  there was no definition of who was supposed to do what. Even John Seibert testified in his deposition, which is in our briefs, that he thought Lightowler was supposed to do a lot of things that they thought they didn't have to do. And the conflict between Steve DeWald and Goldaid from Lightowler versus Seibert from Cedar Rapids in their deposition testimony shows you all you need to know that there was no meeting of the minds. Thank you. Thank you very much. That concludes the arguments in this case. We'll take it under advisement and render a decision in due course. And we thank both of you for your attendance here this morning.